# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

No. 3:18-cv-00205

JANET LYNN PELC, D/B/A RESTORE RENEW; LIBBY GOLDEN, D/B/A ANOTHER LOOK BY LIBBY; AND LOLLIE & GIGI CUSTOM PAINTED FURNITURE, PLAINTIFFS,

v.

ARTISAN STUDIOS, LLC D/B/A AMY HOWARD AT HOME AND AMY HOWARD, DEFENDANTS.

## MEMORANDUM AND ORDER ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW

JEFFREY VINCENT BROWN, UNITED STATES DISTRICT JUDGE.

This case arises from a soured business relationship between plaintiffs Janet Pelc d/b/a Restore ReNew, Libby Golden d/b/a Another Look by Libby, and Lollie & GiGi Custom Painted Furniture and defendants Amy Howard and her company, Artisan Studios, LLC d/b/a Amy Howard at Home (AHAH). The plaintiffs asserted Texas Deceptive Trade Practices Act (DTPA) and breach of contract claims against AHAH and a common-law fraud claim against AHAH and Ms. Howard. The defendants filed a motion for summary judgment, which the court denied.

1

A bench trial followed. AHAH appeared without counsel.[1] Ms. Howard represented herself as to the fraud claim asserted against her. The parties submitted exhibits and presented arguments. Several witnesses testified, included Ms. Pelc and Ms. Howard. Based on the pleadings, briefs, exhibits, testimony, arguments, and applicable law, the court submits the following findings of fact and conclusions of law under Rule 51(a) of the Federal Rules of Civil Procedure.[2]

## FINDINGS OF FACT

### A.    Background

Ms. Pelc has operated her business, Restore Renew, out of the Silver Bee Boutique in Friendswood, Texas, since 2013. Likewise, Ms. Golden operated her business, Another Look by Libby, out of the Silver Bee Boutique from 2013 to 2018. Together, the plaintiffs operate a furniture restoration and home décor business called Lollie & Gigi Custom Painted Furniture. Through their businesses, the plaintiffs remodel and restore old furniture, host workshops, and sell paint and supplies.

AHAH sells high-end "do-it-yourself" cabinet- and furniture-refinishing products. After trying AHAH's products, the plaintiffs became interested in selling

---

[1]    The defendants' counsel withdrew from this case on September 24, 2019. Dkt. 50. This court made clear to the defendants that, as an LLC, AHAH could not proceed pro se at trial. *See Kunstoplast of Am., Inc. v. Formosa Plastics Corp., USA*, 937 S.W.2d 455, 456 (Tex. 1996). At the beginning of trial, the court informed the defendants that, without an attorney representing it, AHAH was in default as to the claims against it.

[2]    Any findings of fact that are also, or only, conclusions of law are so deemed. Any conclusions of law that are also, or only, findings of fact are so deemed.

them to the general public at their store. In early September 2013, Ms. Pelc began emailing with Ms. Howard about becoming a vendor of AHAH products. Ms. Howard told Ms. Pelc about some of AHAH's current retailers and how well they do in sales. She also directed Ms. Pelc to reach out to Dana Vaughn, a sales manager with AHAH, who could discuss the retailer requirements with her.

On September 13, 2013, the plaintiffs and AHAH entered into a contract by which the plaintiffs would purchase paint and other products from AHAH to resell to the public. As part of that arrangement, AHAH agreed to provide the plaintiffs with the full line of AHAH products. In return, the plaintiffs agreed to purchase a minimum dollar amount of AHAH products at regular intervals. This contract also provided the plaintiffs with "zip code protection," which gave them the exclusive right to sell AHAH products within an established geographic area. AHAH could relinquish zip code protection if the plaintiffs failed to meet minimum sales requirements.

Zip code protection was an important feature of the deal. Ms. Pelc testified that she communicated that importance to Ms. Howard and Ms. Vaughn during negotiations. At trial, Ms. Howard confirmed that she knew zip code protection was important to the plaintiffs. During Ms. Pelc's discussions with Ms. Vaughn,[3] the parties agreed that the deal afforded the plaintiffs zip code protection in areas

---

[3] The contract established that Ms. Vaughn was to "handle specific questions on zip code protection and questions about products." Pls.' Ex. 1 at 5.

including Friendswood, parts of Pearland, and League City—approximately a 10-mile radius around the plaintiffs' store.

## B. The Ace Hardware Deal

This arrangement carried on smoothly until 2015, when AHAH entered into a contract with Ace Hardware to make the well-known retailer a nationwide distributor of AHAH products. This contract provided, among other things, that AHAH would sell its products exclusively to Ace Hardware but could continue selling its products to its "current independent store customers" at the time of the deal, including the plaintiffs. Plts.' Ex. 17 at 2. Notably, however, the contract did not mention the retailers' zip code protection. Ms. Howard testified at trial that Ace Hardware representatives told her the retailers' zip code protection would be honored, but she produced no evidence, besides her own testimony, substantiating that claim.

Several of AHAH's independent retailers, including the plaintiffs, expressed concern about the Ace Hardware contract and their ability to compete with the national retailer. In response, AHAH representatives and Ms. Howard made several promises to the retailers, including the plaintiffs, that their zip code protection would be honored under the Ace Hardware deal. For example, Ms. Howard sent the retailers a personal video in which she gave reassurances to that effect. Similarly, Ms. Vaughn sent an email to the retailers addressing the concerns about zip code protection that included the following information:

Each existing Amy Howard at Home retailer who is on target with their yearly quotas of $1000.00 per month will maintain their existing territory. Please rest assured our goal in this new journey is not to replace our existing retailers, but to help gain national exposure. It's really not any different from a new retailer being set up... your territory is still yours.

Plts.' Ex. 10 at 3.

After receiving these reassurances, the plaintiffs were initially receptive of the Ace Hardware deal and the greater public exposure to AHAH products that it could bring. But they were alarmed when they learned that AHAH products were going to be sold in the Ace Hardware store in their same shopping center and another store a short drive from their store. The plaintiffs emailed Ms. Howard to express their concern. They told her that it was their understanding their territory would be protected and it would "devastate [their] business" if Ace Hardware sold AHAH products in such close proximity. Plts.' Ex. 12 at 1.

Ms. Howard responded that she was "devastated" to hear about the Ace Hardware stores in the plaintiffs' shopping center carrying AHAH products and would ask that that store remove the products. Plts.' Ex. 15 at 1. She also told the plaintiffs that she would give them a discount on their purchases:

I will also tell Dana [Vaughn] to give you a 30 percent discount on the paint. I'm not interested in making profit on you.. I just want you taken care of. . . . Let's not worry about this.. Allow me to call the store near you.

*Id.* at 2.

At trial, Ms. Pelc testified that she later confirmed this discount over the phone with both Ms. Howard and Ms. Vaughn. Ms. Pelc's understanding was that

5

the discount was not in exchange for anything but was Ms. Howard's way of "taking care of" the plaintiffs. She also testified that her understanding was that the discount would be given indefinitely. Ms. Howard disputed that testimony, contending that the thirty-percent discount was not intended to be given indefinitely. Instead, she maintained, the discount constituted a new agreement between the parties to placate the plaintiffs until the Ace Hardware nearest the plaintiffs ceased carrying AHAH products. In other words, Ms. Howard argues the plaintiffs waived their zip code protection by accepting the thirty-percent discount.

The court disagrees. Ms. Pelc's testimony and the related exhibits are more credibly persuasive than Ms. Howard's position. I find that the thirty-percent discount was intended to be given indefinitely—at least until the nearby Ace Hardware stores removed the AHAH products (which never happened).

In any event, the thirty-percent discount went into effect in November 2015 and remained in place for more than two years. In January 2018, however, AHAH informed the plaintiffs that it was revoking the discount, purportedly because the Ace Hardware across the street from the plaintiffs had stopped selling AHAH products. The plaintiffs did not take the news well, in part because that Ace Hardware store had not, in fact, discontinued selling AHAH products. In the meantime, the plaintiffs had continued selling AHAH products under the terms of the parties' original 2013 contract. But as the availability of many AHAH products to independent retailers dwindled after the Ace Hardware deal, the plaintiffs struggled to stock products that they previously had been able to offer to their

customers.[4] The loss of zip code protection, in addition to the limited availability of AHAH products, severely disadvantaged the plaintiffs' business. This lawsuit ensued.

## C.     The Plaintiffs' Damages Model

The plaintiffs did not present any expert testimony as to their damages. They did, however, present the following evidence of their year-over-year sales data for 2014 through 2018:

| ACTUAL SALES | | |
|---|---|---|
| **Year** | **Actual Gross Sales** | **% +/- Over Previous Year** |
| 2014 | $60,425.93 | |
| 2015 | $65,987.88 | 9.20% |
| 2016 | $83,545.56 | 26.61% |
| 2017 | $47,520.42 | -43.12% |
| 2018 | $50,043.79 | |

The plaintiffs argue that their lost-profits damages should be measured by gross profits minus any costs of goods sold (*i.e.*, the expenses that would have been attributable to those sales). They argue in favor of this deviation from the general

---

[4]     The plaintiffs complain that after the Ace Hardware deal took effect, they had trouble obtaining, and offering for sale, the same wide variety of products from AHAH. Ms. Pelc testified that customers were disappointed when AHAH products the plaintiffs had once carried were no longer available in their store, even though they were often available at Ace. In the joint pretrial order, the defendants contend that "Boutique Retailers had access to all current AHAH products and were never restricted to a different inventory. Ace Corporate ordered in larger quantities and stored in their warehouses. When an AHAH product became discontinued and unavailable, Ace warehouses still had those products available in their warehouses for Ace stores to purchase until they depleted their inventory." Joint Pretrial Order at 11. In any event, the fact that Ace stores often offered AHAH products that the plaintiffs did not, or could not, further disadvantaged the plaintiffs' business.

rule—that lost-profits damages ought to be measured by net profit—because they argue it does not apply in situations where the non-breaching party does not have the opportunity to reduce its expenses. *See DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 428–29 (5th Cir. 2003). In a post-trial brief filed at the court's request, the plaintiffs provide two alternative models of lost-profits damages.

### 1. The plaintiffs' preferred model

Under their preferred model, the plaintiffs seek to calculate damages based on their expected growth but for the defendants' conduct. Ms. Pelc testified that she believed it would have been reasonable for the business to grow by 15% from 2016 to 2017 and 15% from 2017 to 2018. If that growth had occurred, the plaintiffs' business would have realized $96,077.39 in projected gross sales for 2017 and $110,489.00 in projected gross sales for 2018. The plaintiffs subtracted the actual gross sales from the respective years to arrive at the incremental difference between what they actually sold versus what they testified they believe they would have sold, if not for the defendants' conduct. Consequently, in 2017, the plaintiffs testified they would have had an additional $48,556.97 in sales in 2017 and an additional $60,445.21 in sales in 2018.

The plaintiffs also presented evidence that their expenses (other than actual paint costs, as reduced by the thirty-percent discount) did not change during this period, resulting in a 74.31% return on their gross sales of AHAH products during this time. Given that, the plaintiffs contend that their gross sales need to be reduced only by the expenses that would have been incurred from additional

sales—namely, the cost of buying the additional AHAH products. Based on the 25.69% overhead on paint sales (derived from the actual sales numbers in 2016), the plaintiffs testified that lost profits should be calculated at $36,071.89 for 2017 and $44,915.73 for 2018, resulting in a total of $80,997.52.

The defendants contested the plaintiffs' preferred model for lost profits—namely the 15% growth expectation. Joseph Leo, a forensic accountant, testified for the defendants that the plaintiffs' monthly sales data was not nearly as favorable as they had suggested it to be and the damages the plaintiffs testified to were not substantiated by the records presented. In their opposition to the plaintiffs' post-trial damages brief, the defendants contend that the 15% sales growth expectation is "unrealistic." Dkt. 70 at 5.

The court agrees.[5] Without a foundation for the plaintiffs' 15% expected growth model besides Ms. Pelc's belief that it could have been attainable,[6] that number is unsubstantiated as a starting point for calculating lost-profits damages.

## 2. The plaintiffs' alternative model

Alternatively, the plaintiffs argue that they are entitled to damages in the form of profits from AHAH products earned by Ace Hardware stores within their territory. Given that AHAH products are specialty items, the plaintiffs argue that

---

[5]     The plaintiffs objected to Mr. Leo's testimony and the court carried the objection. By including it here, the court has effectively overruled the objection. But even if Mr. Leo's testimony were not taken into account, the court would not have found the plaintiffs' preferred damages model persuasive.

[6]     Indeed, at trial, Ms. Pelc referred to the 15% growth target as "a lofty goal."

any sale by a competitor in their area represents a sale that would have otherwise gone to them. Therefore, any profits made by an Ace Hardware store within the zip code protected area should be attributed to the plaintiffs.

At trial, the plaintiffs presented as witnesses five managers or owners of Ace Hardware stores within the plaintiffs' geographically protected area. These witnesses verified profit statements from their store during the time frame at issue. The plaintiffs established through exhibits and testimony that the Ace Hardware stores within this territory profited $41,966.21 from sales of AHAH products. After extrapolating those profits to fill in certain gaps, the total of lost profits comes to $47,942.72.[7] The defendants contend that not "every purchase made at ACE was by a customer who knew about Plaintiffs' business and chose to go to ACE instead." Dkt. 70 at 7. Nevertheless, but for AHAH's Ace Hardware deal, zip code protection would have ensured all sales of AHAH products in that territory went to the plaintiffs.

But even under this model, the plaintiffs suggest that the thirty-percent discount should be taken into account. In other words, the plaintiffs want to apply an additional thirty-percent profit to the $47,942.72 for a total of $62,325.54 in lost profits. This is unpersuasive. While the defendants gave that discount for an indefinite amount of time, it does not logically follow that the discount would have

---

[7] Certain stores had incomplete financial records. In these cases, the plaintiffs calculated the store's average profit per year on AHAH products and then extrapolated that average to calculate the estimated profit on AHAH products during the period for which the store's records were incomplete. Dkt. 66 at 7.

applied had Ace Hardware stores not carried AHAH products in the first place or if Ace Hardware stores ceased carrying AHAH products. The evidence and testimony submitted substantiates lost-profits damages for a total of $47,942.72; an additional thirty percent should not be included.

## CONCLUSIONS OF LAW

This court has jurisdiction over this dispute because there is complete diversity of the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. Texas law applies.

At trial, AHAH appeared without counsel, despite being informed on multiple previous occasions that an LLC cannot represent itself. The defendants requested that the trial be continued until after they could secure an attorney. Because the defendants had been informed that AHAH could not proceed pro se as early as September 2019, when their attorney withdrew, and the trial date had already been pushed from its original December 2019 setting to accommodate the defendants' request, that request was denied. The defendants had several months to acquire new counsel and failed to do so, even after being warned of the consequences and that this court would not entertain trial continuances without good cause.

The court informed the defendants that AHAH was in default as to the claims against it: the DTPA claim, the breach-of-contract claim, and the common-law fraud claim. The bench trial proceeded on the issues of damages as to AHAH and both liability and damages as to Ms. Howard.

## A.    The Common-Law Fraud Claim

The plaintiffs sued AHAH and Ms. Howard individually for common-law fraud. Under Texas law, a claim for common-law fraud requires "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (internal quotation marks omitted) (quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)). Misrepresentation means "a false statement or fact" or "a promise of future performance made with an intent, at the time the promise was made, not to perform as promised." *Id.* As noted, AHAH defaulted on this claim.

At trial, the plaintiffs carried their burden of demonstrating that Ms. Howard is liable for common-law fraud. Ms. Howard made several statements that constituted material misrepresentations to the plaintiffs, including:

- Ms. Howard told the plaintiffs that she would enforce the zip-code protection after the plaintiffs discovered nearby Ace Hardware stores would be carrying AHAH products.
- Ms. Howard told the plaintiffs that she would give them a thirty-percent discount on their AHAH purchases.
- Ms. Howard told the plaintiffs that she would supply them with the full line of AHAH products.

The plaintiffs have shown, through exhibits and credible witness testimony, that Ms. Howard intended for them to rely on those misrepresentations so that

they would continue to be an AHAH retailer—even though Ms. Howard knew that she could not or would not fulfill those promises. In believing Ms. Howard's reassurances that the Ace Hardware deal would not affect their business, the plaintiffs continued to uphold their end of the bargain to their detriment. They lost sales of AHAH products to nearby Ace Hardware stores for years after Ms. Howard told the plaintiffs that she would have the products removed. They were unable to order the full line of AHAH products because the certain paints—which the plaintiffs' customers had come to rely on—became unavailable to them after the Ace Hardware deal. And while the plaintiffs enjoyed the thirty-percent discount for over two years, the defendants revoked it even while the Ace Hardware stores within the plaintiffs' geographically protected territory still carried AHAH products.

Ms. Howard is liable for common-law fraud.

## B.    Novation

At different times throughout this litigation, the defendants raised the argument that the thirty-percent discount constituted a novation. Novation is the creation of a new obligation in place of an old obligation, accomplished by mutual consent with the intent to extinguish the old obligation. *Honeycutt v. Billingsley*, 992 S.W.2d 570, 576 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). "The essential elements of novation are: (1) a previous, valid obligation; (2) an agreement of the parties to a new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract." *Id.* A party asserting novation

as an affirmative defense to a claim for breach of contract bears the burden of proof. *CTTI Priesmeyer, Inc. v. K & O Ltd. P'ship*, 164 S.W.3d 675, 680–81 (Tex. App.—Austin, 2005 no pet.). The intent to have the second agreement substitute for and discharge the first agreement "must be clear; novation is never presumed." *Id.* at 681.

Novation is not applicable here. The defendants do not meet the high bar that novation requires to show that the parties intended to extinguish the 2013 contract with the thirty-percent discount. The plaintiffs argue that the discount was given with the express understanding that the original contract would remain in place. They note that AHAH never told them that the contract was being amended or changed, pointing to Ms. Howard's email where she first promised the discount. Though Ms. Howard stated at trial that she called this offer a "new agreement," her testimony is not credible in light of the evidence. To the extent that a novation might relieve Ms. Howard of liability for common-law fraud, it does not apply.

## C. Damages

The plaintiffs seek lost-profits damages, treble and mental-anguish damages under their DTPA claim, exemplary damages under their common-law fraud claim, and attorneys' fees and costs.

### 1. Actual Damages

The proper measure of damages for this case is benefit-of-the-bargain. *See DP Solutions*, 353 F.3d at 428 (breach of contract); *Baylor Univ. v. Sonnichsen*,

221 S.W.3d 632, 636 (Tex. 2007) (common-law fraud); *W.O. Bankston Nissan, Inc. v. Walters*, 754 S.W.2d 127, 128 (Tex. 1988) (DTPA). "Generally, the measure of damages meeting this standard is net profit." *DP Solutions*, 353 F.3d at 428–29. "However, this general rule does not apply in situations where the breach of contract occurs in such a manner that the non-breaching party does not have the opportunity to reduce its expenses." *Id.* When a defendant's actions reduce the plaintiff's business but do not create any reasonable opportunity for the plaintiff to reduce expenses, gross profits are the appropriate measure of lost-profit damages. *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 888 (Tex. App.—Austin 2006, no pet.).

The plaintiffs' case fits squarely into this exception. Under the parties' contract, the plaintiffs were required to carry the full AHAH line and meet certain sales targets. Besides the thirty-percent discount, the plaintiffs' operating costs as to their partnership with AHAH remained the same. So, in this case, the proper measure of damages is gross profits after deducting for costs of goods sold (*i.e.*, the expenses that would have been attributable to those sales).

The question then becomes how to measure gross profits. As discussed, the plaintiffs' preferred model of measuring lost profits—based on Ms. Pelc's estimate of 15% year-over-year growth from 2016 to 2018—is not substantiated by sufficient evidence. But the plaintiffs' alternative model—based on the profits on AHAH products at Ace Hardware stores in the plaintiffs' geographically protected territory—is. The testimony and records submitted in evidence from those stores

establishes sufficient evidence of $41,996.21 in sales of AHAH products as a result of the defendants' conduct. Dkt. 66 at 7; Plts.' Exs. 34–37. Because any profits made by an Ace Hardware store within the zip code protected area should have been attributed to the plaintiffs, the plaintiffs are entitled to this amount in lost profits.

That leads to the question of how to handle the incomplete financial records for some of the stores. Some of the Ace Hardware stores in the plaintiffs' territory did not have complete records of their sales during the relevant time. To account for these additional sales, the plaintiffs calculated the average sale of AHAH products per year at each store and then extrapolated that number to fill in the gaps. The Fifth Circuit has held that "uncertainty as to the amount of damages does not justify a denial of recovery but requires an award based on a just and reasonable inference." *Shelby v. Boxer Prop. Mgmt. Corp.*, No. 4:16-CV-1549, 2019 WL 8017865, at *6 (S.D. Tex. Sept. 13, 2019) (quoting *O'Meara-Sterling v. Mitchell*, 299 F.2d 401, 404 (5th Cir. 1962)). The plaintiffs have accounted for this reasonable inference in the absence of complete financial records. They are entitled to an additional $5,946.51 in damages.

For the reasons described above, the additional thirty-percent discount does not apply to the calculation of lost profits. So, in total, the plaintiffs are awarded $47,942.72 in actual damages, assessed jointly and severally against AHAH and Ms. Howard.

## 2. Treble Damages

The plaintiffs seek treble damages under their DTPA claim. Under the DTPA, a court may award up to three times the economic damages for a knowing or intentional violation of the DTPA. TEX. BUS. & COM. CODE § 17.50(b)(1). A knowing or intentional violation occurs when there was actual awareness of the falsity or deception at the time it occurred. *Id.* § 17.45(9); *Brown & Brown v. Omni Metals, Inc.*, 317 S.W.3d 361, 395 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Actual awareness means that "a person knows what he is doing is false, deceptive, or unfair." *St. Paul Surplus Lines Ins. Co., Inc. v. Dal-Worth Tank Co., Inc.*, 974 S.W.2d 51, 53–54 (Tex. 1998).

AHAH defaulted on the DTPA claim. But the burden is on the plaintiff to prove that the defendant acted knowingly in violation of the DTPA to support the award of treble damages. *CA Partners v. Spears*, 274 S.W.3d 51, 73 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Here, the plaintiffs meet that burden. They presented evidence that the defendants promised the plaintiffs and other boutique retailers several times that they would honor zip code protection under the Ace Hardware deal—even though protecting the boutique retailers' territories was not compatible with that deal. *See* Plts.' Exs. 9–10. Ms. Vaughn's testimony, in which she states that she was told "that Ace would not allow the retailers to have zip code protection" emphasizes that point. Because AHAH knew that the promises about zip code protection were false when they made them, the plaintiffs have shown that the DTPA violation was committed knowingly.

The plaintiffs are awarded three times the amount of their actual damages, or an additional $95,885.44, under their DTPA claim against AHAH.

### 3. Mental-Anguish Damages

The plaintiffs also seek $10,000 in mental-anguish damages under the DTPA. *See* TEX. BUS. & COM. CODE § 17.50(b)(1). To recover mental anguish damages for a DTPA violation committed knowingly, a plaintiff must show that the defendant's wrongful conduct caused her "a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Reyelts v. Cross*, 968 F. Supp. 2d 835, 846 (N.D. Tex. 2013).

In their post-trial damages brief, the plaintiffs state that they "are seeking $10,000 based on Mrs. Pelc's emotional testimony of the hardship she endured by being betrayed by Mrs. Howard in the many misrepresentations that were made." Dkt. 66 at 8. They add that "Mrs. Howard repeatedly denied her misrepresentations and instead used friendship, God, and family to string Mrs. Pelc along until Mrs. Pelc was completely vulnerable and susceptible, and whom she prayed for and discussed her family, including her grandkids." *Id.* at 9. While Ms. Pelc certainly seemed to find the defendants' actions upsetting, her testimony does not show that she was in "a high degree of mental pain and distress." *See Reyelts*, 968 F. Supp. 2d at 846. No mental-anguish damages are awarded.

### 4. Exemplary damages

Texas law allows for the recovery of exemplary damages upon proof of fraud by clear and convincing evidence. TEX. CIV. PRAC. & REM. CODE § 41.003(a)(1). The

plaintiffs seek exemplary damages of $150,000 each against AHAH and Ms. Howard based on what they allege is the clear and convincing evidence they presented at trial regarding both defendants' fraudulent conduct. For example, the plaintiffs contend that AHAH and Ms. Howard "made numerous, intentional misrepresentations both in writing and orally that zip code protection was alive and well in order to induce Plaintiffs to continue to be retailers." Dkt. 66 at 9. Additionally, the plaintiffs point out that Ms. Howard was "the direct beneficiary of these misrepresentations, both in the company that bears her name and based on the numerous profits she received." *Id.*

The court agrees that the defendants knew they could not honor the boutique realtors' zip code protection under the Ace Hardware deal when they made repeat promises to that effect. The testimony shows that the defendants were presented with an excellent business opportunity with Ace Hardware. Indeed, the Ace Hardware deal was worth over $12 million—a much higher profit than the boutique retailers had earned. *See* Plts.' Ex. 33. But instead of sharing the frank details of that deal with the boutique retailers—and being honest about the fact that they could no longer enforce zip code protection under it—the defendants made promises that they knew they could not keep.[8]

---

[8]     Moreover, as the contract between AHAH and the plaintiffs sets no termination date, it could be terminated by either side at any time. *See* TEX. BUS. & COM. CODE § 2.309(b); *Clear Lake City Water Auth. v. Clear Lake Utils. Co.*, 549 S.W.2d 385, 390 (Tex. 1977) (Reavley, J.) ("contracts which contemplate continuing performance (or successive performances) and which are indefinite in duration can be terminated at the will of either party"). But rather than terminate the contract with the plaintiffs when the Ace Hardware deal came through, Ms. Howard and

The trial court has discretion in awarding exemplary damages. TEX. CIV. PRAC. & REM. CODE § 41.010(b). I find that the plaintiffs have proven, by clear and convincing evidence, that the defendants committed fraud. But given the facts of this case—and, namely, the fact that the actual damages amount to approximately $50,000—I do not find a total award of $300,000 in exemplary damages appropriate.[9] The plaintiffs are instead awarded $10,000 in exemplary damages, assessed each individually against AHAH and Ms. Howard, for a total of $20,000.

## 5. Attorneys' Fees

The DTPA provides that a prevailing plaintiff shall recover attorneys' fees. TEX. BUS. & COM. CODE § 17.50(d) ("Each consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees."). Though a prevailing party must segregate recoverable from unrecoverable fees, the fees that were incurred and necessary for both recoverable and unrecoverable claims need not be segregated. *A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007). In those cases, the party can instead segregate the unrecoverable fees by subtracting a percentage of the overall fee amount so that the requested fees include only those fees that pertain to the recoverable claim. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006).

---

AHAH preferred to take the Ace money while still stringing along the independent retailers—to have their cake and eat it, too.

[9]    In addition, the trebling of the plaintiffs' actual damages under the DTPA has already, at least to some extent, satisfied the purpose of exemplary damages.

The plaintiffs seek $98,108.55 in attorneys' fees and costs. In their motion for attorneys' fees, the plaintiffs attach a declaration of lead plaintiffs' counsel, Kevin Terrazas, who testifies to the reasonableness of the hourly fees, the reasonableness of the hours spent on this case, and the necessity of the hours spent on the case. Dkt. 67 at 4–8. They also attach detail time entries. *Id.* at 9–18.

Though the DTPA claim represents just one of the plaintiffs' three claims, Mr. Terrazas testifies that all claims arose from the same set of facts. Indeed, he states that there is no single task that the plaintiffs could identify that did not involve the DTPA. Instead, the plaintiffs reduced their total fees by 10% to accommodate for a reasonable approximation of the portion of tasks performed that did not completely involve the DTPA claim. The plaintiffs similarly exercised billing judgment and reduced redundant fees to further minimize the request.

The plaintiffs have met their burden in proving reasonable and necessary attorneys' fees. *See Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (listing several factors that a factfinder should consider when determining the reasonableness of a fee). Their method of reducing their total fees by 10% is sufficient to account for segregating out unrecoverable fees. They are awarded attorneys' fees and costs in the full amount proven, or $98,108.55.

\* \* \*

The court finds and concludes that:

- Default judgment is entered against AHAH on the three claims asserted against it: the DTPA claim, the breach-of-contract claim, and the common-law fraud claim.

- Ms. Howard is liable for common-law fraud.

- The parties entered into a valid contract by which AHAH promised the plaintiffs "zip code protection"—a geographically protected area in which they were to be the exclusive retailer for AHAH products.

- AHAH breached that contract when it entered a deal with Ace Hardware that interfered with the plaintiffs' zip code protection.

- Independent AHAH retailers, including the plaintiffs, expressed concerns about their zip code protection under the Ace Hardware deal.

- AHAH and Ms. Howard made repeat promises to the independent retailers, including the plaintiffs, that their zip code protection would be honored, even under the new Ace Hardware deal.

- After the plaintiffs discovered that nearby Ace Hardware stores were selling AHAH products, Ms. Howard offered them a thirty-percent discount and told the plaintiffs she would have Ace Hardware remove the AHAH products.

- Ms. Howard knew that the plaintiffs' zip code protection would not be honored under the Ace Hardware deal.

- The defendants' statements about honoring the independent retailers' zip code protection constituted material misrepresentations.

- The subsequent thirty-percent discount was not contingent on the plaintiffs waiving their zip code protection.

- The defendants promised the plaintiffs that they would be able to buy all available AHAH products.

- The availability of certain AHAH paints to independent retailers was phased out after the Ace Hardware deal.

- AHAH products were not removed from the Ace Hardware stores in the plaintiffs' geographically protected area.

- The plaintiffs' business suffered as a result of the defendants' conduct.

The plaintiffs are entitled to a total of $163,828.16 in damages and $98,108.55 in attorneys' fees and costs. Damages are awarded as follows:

- The plaintiffs are awarded $47,942.72 in actual damages, assessed jointly and severally against AHAH and Amy Howard.

- The plaintiffs are awarded $95,885.44 in treble damages based on the DTPA claim, assessed against AHAH.

- The plaintiffs are awarded no mental-anguish damages.

- The plaintiffs are awarded a total of $20,000 in exemplary damages for the fraud claim, with $10,000 assessed each individually against AHAH and Ms. Howard.

- AHAH is to pay $98,108.55 in attorneys' fees and costs.

  Final judgment will be entered separately.

  SIGNED on Galveston Island this 24th day of March, 2020.

  _____
  JEFFREY VINCENT BROWN
  UNITED STATES DISTRICT JUDGE